**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

KELLY A. MCPHEE,

　　　　　　　　　　　　　　　　CASE NO. 16-cv-13969
　　　　　*Plaintiff*,　　　　　　　MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL SECURITY,

　　　　*Defendant.*
_____/


## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
### (Docs. 12, 15)

**I.　　OPINION**

**A. Introduction and Procedural History**

　　　　This is an action for judicial review of a final decision by the Commissioner of

Social Security denying Plaintiff Kelly McPhee's claim for disability benefits under the

Disability Insurance Benefits program of Title II, 42 U.S.C. § 401 *et seq*. (Doc. 1). The

case is before the undersigned magistrate judge pursuant to the parties' consent under 28

U.S.C. § 636(c), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference. (Docs. 11, 13).

The matter is currently before the Court on cross-motions for summary judgment. (Docs.

12, 15).

　　　　McPhee was born on October 5, 1974, (Tr. 22), making her 36 at the time she filed

her initial application for Disability Insurance Benefits on April 18, 2011. (Tr. 116) She

alleged a disability beginning on December 17, 2010. (Tr. 115). After the Commissioner

denied her claim, (Tr. 115-23), McPhee requested a hearing, (Tr. 148-49), prior to which

1

she amended her alleged onset date to September 15, 2008. (Tr. 181, 386). The hearing was held before Administrative Law Judge Ethel Revels, (Tr. 37-71), and included testimony from both McPhee, (Tr. 41-65), and Vocational Expert Diane Regan. (Tr. 65-70). Ultimately, the ALJ found that McPhee had not been under a disability during the relevant time period. (Tr. 127-135). The Appeals Council, however, remanded the case due to the ALJ's failure to properly consider the opinion of treating physician Dr. Jilani, and failure to evaluate a third-party function report from McPhee's sister. (Tr. 140-43). A second hearing was held before ALJ Revels, and McPhee and Vocational Expert Regan both testified once more. (Tr. 73-114). Again, the ALJ found that McPhee had not been under a disability, (Tr. 17-35), and this time the Appeals Council denied McPhee's request for review. (Tr. 1-6). This action followed.

**B. Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically

determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to

show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

After McPhee's second hearing, the ALJ issued her decision on October 6, 2015. (Tr. 17-28). At step one, the ALJ found that McPhee had not engaged in any substantial gainful activity between her alleged onset date of December 17, 2010, and her date last insured of December 31, 2013. (Tr. 22). She determined McPhee had the following severe impairments: "residuals status post cervical fusion," osteoarthritis of the back, obesity, and a learning disorder. (*Id.*). Next, she found that McPhee did not have an impairment that met or medically equaled the severity of a listed impairment, explaining that she "is ambulatory and does not meet listing listing (sic) 1.04 as she is ambulatory. There is no listing for obesity." (Tr. 23). She then determined that McPhee had the residual functional capacity

> to perform light work . . . except she needed simple, routine tasks such as those jobs with an svp of 1 or 2 because of occasional limitations in her ability to maintain concentration for extended periods because of pain but not off task more than 10% of the workday; the work must require only frequent use of the hands; involve only occasional bending; no kneeling, crouching, or crawling; must not involve operating in temperature extremes or wet or humid areas; no overhead reaching; no more than occasional lifting of head in an up/down motion; no above eye level work; no full rotation of the neck; no operating at hazardous heights; or climbing ladders, ropes, or scaffolds. The work must allow for a sit or stand option at will not in excess of 30 minutes at a time.

(*Id.*)

Finally, the ALJ found that McPhee could not perform her previous work of molded rubber goods cutter or certified nursing assistant ("CNA"), but that jobs "existed in significant numbers in the national economy that the claimant could have performed." (Tr. 26) (internal citation omitted).

## E. Administrative Record

### 1. Medical Evidence

The Court has thoroughly reviewed McPhee's medical record. In lieu of summarizing her medical history here, the Court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2. Application Reports and Administrative Hearing

#### a. McPhee's Function Report

McPhee completed her Function Report on June 10, 2011. (Tr. 330). At that time, she was married and living with her husband. (Tr. 323).

She complained that since her neck surgery, she "seem[ed] not to get better." (Tr. 323). She had no longer been able to work as a CNA or take care of her mother's housework. (Tr. 324). She could not lift heavy objects or bend over because it caused pressure in her neck and head, and she could not reach overhead without "severe pain." (Tr. 323). Carrying objects caused pain in her neck, in her arms, and down her back. (*Id.*). Her left side was weaker than her right. (*Id.*). She also suffered from headaches and muscle spasms. (*Id.*).

Now, her daily routine involved waking up, using the bathroom, and resting in a reclined position "for a little bit" before showering, making and eating breakfast, and doing the dishes. (Tr. 324). She then reclined or lay in bed until lunchtime, when she made lunch, got the mail, and cleaned up a little around the house before reclining again until dinner. (*Id.*). She found it hard to sleep due to the pain and muscle spasms. (*Id.*).

She was still able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr 326). She was also able to dress, shower, shave, and use the toilet without assistance, (Tr. 324), although she did not take baths because she found it "hard [to] get in [and] out," and she was limited to shaving "maybe once or twice a month" because bending over was painful. (*Id.*) As for her hair, she was able to wash it, comb it, and put a clip in it, but could not style it further without pain. (*Id.*).

With her husband's help, she prepared "simple meals" daily that did not require her to "stir or cut much." (Tr. 325). She could clean for about 30 minutes before she needed to take a break. (*Id.*). She got help with the laundry and did not do repairs or mow the grass because the vibration made her arms, neck, and hands hurt. (*Id.*).

Her social life had also suffered since her onset. She reported that she used to be a "very outgoing person," but that now it was hard for her to do "a lot of things" because repetitive actions made her necks, arms, and hands hurt, and she sometimes had difficulty holding her head up. (Tr. 330). Before her onset, she enjoyed going shopping, visiting with friends, playing cards, and taking care of her niece and nephew "a lot." (Tr. 327). Her hobbies post-onset consisted of watching TV and visiting family, namely her sister or

mother. (*Id.*). How often she was able to visit "depend[ed] on how I feel," and she could not visit for "to[o] long" before needing to lie down or recline. (*Id.*).

She marked the following as affected by her condition: lifting, sitting, bending, kneeling, using hands, reaching, memory, and concentration. (Tr. 328). She estimated that she could lift about 10 pounds, and could walk a mile before needing to stop and rest for an hour or two. (*Id.*). Bending, reaching, and kneeling made her neck, arms, and hands hurt. (*Id.*). As for her memory and concentration difficulties, she estimated that she could pay attention for "maybe 2-5" minutes, although she also checked that she could finish what she started, "[f]or example, a conversation, chores, reading, watching a movie." (Tr. 329).

### b. McPhee's Testimony at the Second Administrative Hearing[1]

McPhee again began by testifying about her previous employment, beginning with her work from 1996 to 2001 in a factory in a "deflasher" area, where she put silicone parts into a machine that tumbled them with special rocks in order to remove the extra silicone; she then took the parts out of the machine and transported them elsewhere in the factory for cleaning. (Tr. 82-86). From 2002 to 2008, she worked as a CNA. (Tr. 86).

She stopped working on September 15, 2008, because the next day she had neck surgery fusing C5-C6 for a herniated disc. (Tr. 88). After the surgery, she "had more pain and then I couldn't do anything after surgery because it . . . hurt to do anything." (Tr. 89).

---

[1] McPhee's testimony at the first administrative hearing, (Tr. 37-71), was substantially similar to her testimony at the second hearing, except that she testified about her back pain in slightly more detail: "The pain in the middle of my back goes all the way down to my left—left leg down to my foot. It goes numb and then tingling pains." (Tr. 49). She also described how her pain made it difficult for her to focus. (Tr. 56-57).

She had pain "like pressure" that was "[i]n my neck and down to my left and right arm," in addition to "weakness." (Tr. 89-90). She "couldn't lift anything because I would drop it. . . . There was nothing I could do to keep it in my grasp, and my left side is worse than my right side." (Tr. 90). She was not able to reach overhead at any point after her surgery and before her insurance expired on December 31, 2013—"it just killed me to." (Tr. 90-91). She explained that reaching made her "feel all this pressure and it makes you weak and then . . . I have to lay down. . . . It feels like my head's a million pounds." (Tr. 91). She could reach her right arm in front of her body with some issue, but her left side was too painful to grasp or lift things; "they say that's because I have a pinched nerve." (Tr. 91-92). Turning her head to the left or right was difficult, and looking down was "horrible," because it causes "pressure, and then I get weak and then it just feels like my head's too heavy." (Tr. 94). Aside from neck pain, she also complained of back pain radiating down her left side, as well as "pinching" and a condition that sometimes caused her to drag her foot. (Tr. 98-99).

As for her treatment, she testified that she had pursued several treatment options with different doctors for her neck and back pain. (Tr. 94-100). Dr. Schell had referred her to Dr. Jilani, who prescribed physical therapy and walking to help rebuild her muscle. (Tr. 94). She was still in physical therapy at the time of the hearing, and usually attended three 45-minute sessions a week. (Tr. 94-95). "They said I'll never get stronger but as long as I keep trying, it'll keep me a little more mobile." (Tr. 95). Dr. Jilani and her family doctor, Dr. Reiter, prescribed her pain medication, muscle relaxants, and

medication for anxiety. (Tr. 95-97). The medication "didn't relieve" her pain, but "made it tolerable," reducing it from a 10 to about a 6 on the pain scale, although she had "good days" and "bad days." (Tr. 98). She had also gotten nerve blocks in her neck and back, but not before her insurance cut-off date, December 31, 2013. (Tr. 96-97).

Next, McPhee described her daily activities. She indicated that since the previous hearing, she had gotten divorced and moved in with her mother. (Tr. 100). On an average day, she said, "I'd get up, make something to eat, and then I'd lay back down and rest for a while, may watch TV a little bit, but that would just aggravate me." (Tr. 100). A typical meal was oatmeal or "Eggo waffles," both of which she found easy to make. (Tr. 101). After eating, she would lay down "for a few hours . . . [t]o relax my neck because it would spasm." (*Id.*) She would do the dishes "gradually," working for about five minutes and then taking a half-hour to two-hour break to sit or lay down. (Tr. 101-02). She got help with household chores—her sister did the grocery shopping, while her mother or sister did the laundry because "the bending and twisting aggravated my neck." (Tr. 102-04). Her brothers did the yardwork. (Tr. 104). Her mother cleaned the house. (Tr. 103-04). She could drive a "short distance," for example, to check the mail or "go to my mom's, just do a little visit." (Tr. 102-03). She did not participate in any groups, clubs, volunteer work, or religious services. (Tr. 103). She socialized with her mother, but nobody else unless they came to the house. (*Id.*)

At the conclusion of McPhee's testimony, the ALJ also noted that Dr. Jilani had issued some work and activity restrictions for McPhee on June 26, 2012, which applied through December 31, 2013. (Tr. 104-05).

### c. The VE's Testimony at the Second Administrative Hearing

The VE began by classifying McPhee's prior work as a molded goods cutter (unskilled medium work) and as a CNA (semi-skilled medium work). (Tr. 106).

The ALJ offered her first hypothetical, asking the VE to "assume a person the claimant's age, educational level, and work experience," but with "additional limitations . . . that will allow for no more than frequent use of the hands, occasional bending, no kneeling, crouching or crawling, no operating in temperature extremes or wet or humid areas, no overhead reaching, occasional lifting of the head in an up and down motion . . . no full rotation of the neck, no operating at hazardous heights or climbing of ladders, ropes or scaffolds, our hypothetical claimant needed a sit/stand option, if you assume that, would our hypothetical claimant be vocationally qualified to perform either of the prior relevant jobs?" (Tr. 106-07). She would not, said the VE. (Tr. 107).

Next, the ALJ asked whether light jobs existed for a hypothetical claimant with the same limitations, who also "needed work that was routine, simple routine tasks such as the jobs at the SVP 1 or 2 level, because I do find occasional limitations in ability to maintain concentration for extended periods, but not off task more [than] 10 percent of the day." (Tr. 107).

The VE offered "packer" (3,000 jobs in SE Michigan, 150,000 in the national economy), "sorter" (2,500 jobs in SE Michigan, 100,000 in the national economy), and "inspector" (3,000 jobs in SE Michigan, 100,000 in the national economy). (Tr. 108). These jobs would remain even with the added limitation that "the work must not be above eye level." (Tr. 108). The VE indicated that the classifications and requirements of the jobs were consistent with the Dictionary of Occupational Titles (DOT) except that some topics are not addressed by the DOT: the "[s]it/stand option, time off task, the occasional lifting of head in an up and down motion" and the limitation regarding no work above eye level. These classifications were made based on the VE's "experience in the field[.]" (*Id.*).

The ALJ then asked: "[I]f an individual needs to leave work three times a week for approximately, we'll say, an hour and 15 minute period, in a competitive work environment, is that something that an employer in your experience is going to tolerate?" (Tr. 108-09). No, the VE responded. (Tr. 109). Further, "unscheduled breaks four to five times a day for 15 minutes" would also be work preclusive, as would more than one absence per month on a consistent basis. (Tr. 110-11).

The ALJ continued, "And if we use those same limitations that the Judge indicated, I think in her third hypothetical, if we add to that occasional handling and fingering, does that change any of the jobs you identified?" (Tr. 109-110). With those limitations, the only job available would be "[j]ust at the sedentary unskilled level, the surveillance system monitor," with 800 jobs in southeast Michigan and 60,000 in the

national economy. (Tr. 110-12). Surveillance system monitor would remain the only job available if the claimant could only occasionally reach in front of herself. (Tr. 111).

## F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

14

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

A claimant's description of her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "[O]bjective evidence of the pain itself" is not required. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G. Analysis

McPhee challenges the Commissioner's decision on two grounds: (1) that the ALJ lacked substantial evidence for her Step Three determination that McPhee's impairments

did not meet or medically equal a listed impairment, and (2) that the ALJ lacked substantial evidence for her evaluation of several medical opinions in the record.

First, I turn to the issue of whether the ALJ conducted a proper Step Three analysis. Step Three of the SSA's five-step sequential evaluation process requires the ALJ to analyze whether a severe impairment meets or is medically equivalent to one of the listed impairments; if so, the claimant is presumed disabled and no further analysis is necessary. *Christephore v. Commissioner of Social Security*, 11-13547, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Commissioner of Social Security*, 424 F. App'x 411, 416 (6th Cir. 2011)); 20 C.F.R. §§ 404.1520. In order to facilitate meaningful review, an ALJ must analyze a claimant's impairments under this step and give a reasoned explanation of her findings. *See Reynolds*, 424 F. App'x at 416. The rule that an ALJ must "evaluate the evidence," compare it to the Listing, and "give an explained conclusion" is "prudential and not jurisdictional"—it is impossible to determine whether substantial evidence supports an ALJ's determination without this analysis. *Id.* Because the requirement is prudential, a plaintiff cannot waive this argument by not raising it. *Id.*

Here, the ALJ's entire Step Three analysis consists of two sentences: "The claimant is ambulatory and does not meet listing listing (sic) 1.04 as she is ambulatory. There is no listing for obesity." (Tr. 23). The ALJ thus found that "[t]hrough the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments." (Tr. 23).

18

Listing 1.04 may be met in three distinct ways:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

An inability to ambulate effectively "means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id*. at 1.00(B)(2)(b)(1).

Here, the ALJ's curt analysis betrays her error—she states that McPhee "does not meet listing listing (sic) 1.04 as she is ambulatory." Although 1.04(C) does require the claimant to be unable "to ambulate effectively," 1.04(A) and 1.04(B) contain no such

requirement. Thus, a claimant who can "ambulate effectively" could still have an impairment or combination of impairments that meet or medically equal Listing 1.04. It is simply incorrect to say that a claimant cannot meet Listing 1.04 for the sole reason that she is ambulatory, and thus it is an error requiring remand.

An ALJ who fails to undertake a detailed Step Three analysis has erred; further, the error is not harmless because the claimant might be presumed disabled with no need of any functional analysis at Steps Four and Five. *Reynolds*, 424 F. App'x at 416. An ALJ is not required, however, to consider every Listing or to consider Listings that the claimant "clearly does not meet." *Sheeks v. Commissioner of Social Security Administration*, 544 F. App'x 639, 641 (6th Cir. 2013). The claimant carries the burden of proof at Step Three and therefore, as the Third Circuit has observed, the ALJ's analysis need not be extensive if the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment"). Consequently, an ALJ's Listing analysis must always be viewed in light of the evidence the claimant presents.

As an initial matter, the ALJ did find that one of McPhee's severe impairments was her "osteoarthritis of the back," (Tr. 22), which is one of the "disorders of the spine" explicitly targeted by Listing 1.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The Commissioner argues at length that the ALJ was not required to address Listing 1.04(A), however, because McPhee "cannot establish that her impairments met this listing,

20

especially for the requisite 12 months." (Doc. 15 at 1099) (citing Acquiescence Ruling 15-1, 80 Fed. Reg. 57418, 57420 (Sept. 23, 2015) ("[F]or a disorder of the spine to meet listing 1.04A . . . the claimant must establish the simultaneous presence of all the medical criteria in Paragraph A. Once this level of severity is established, the claimant must also show that this level of severity continued, or is expected to continue, for a continuous period of at least 12 months.")). The Commissioner points out that at times McPhee had a normal range of motion of her spine, (Tr. 818, 899), normal strength, (Tr. 656, 735, 818), "grossly normal" motor function, (Tr. 833), negative straight leg raising tests, (Tr. 614, 656, 818), and no radiating pain. (Tr. 655). (Doc. 15 at 1098-99). Additionally, she notes that a July 2013 EMG showed no electrodiagnostic evidence of active or chronic radiculopathy of the cervical or lumbosacral region. (Tr. 809); (Doc. 15 at 1099).

The Commissioner is also correct that McPhee provides no record citations in her argument section to support her contention that her impairments met Listing 1.04. (Doc. 15 at 1097). The Commissioner goes too far, however, in saying that "the record does not even suggest she met these listings." (*Id.*). To the contrary, the record provides evidence that McPhee experienced all of the elements of Listing 1.04(A): A 2013 MRI disclosed "mild displacement of the left L3 nerve root," (Tr. 733); McPhee repeatedly experienced pain radiating from her lower back down her leg, (*e.g.,* Tr. 413, 614, 616, 622, 657, 660, 679, 735, 737, 744, 755, 809, 817, 843, 851, 862), limitation of the motion of her spine (Tr. 413, 614, 622, 624, 657, 679, 737, 899), muscle weakness, (Tr. 680, 737, 817, 851), and numbness, (Tr. 413, 680, 737, 744, 751, 817, 851); and she experienced at least four

instances of a positive straight-leg raising test before her insurance cut-off date in December 2013, (657, 679, 899, 737), as well as one in October 2014. (Tr. 990).[2] A neurologist also noted in early 2014 that McPhee had "decreased vibration sense, more on the left than the right," and that her "[p]lantar reflexes were down going." (Tr. 998).

Thus, the medical record and the parties' briefs reveal an evidentiary close call. Although the Commissioner puts forth a good argument, that argument is no substitute for the proper standard and analysis that were the ALJ's responsibility. I conclude the ALJ's failure to compare McPhee's impairments to Listings 1.04(A) is not harmless.

McPhee also mentions Listing 1.04(B) in passing, asserting that the ALJ did not evaluate McPhee's limitations "under 1.04A or 1.04B as she was required to do." (Doc. 12 at 1073). But as the Commissioner points out, McPhee "provides no evidence of spinal arachnoiditis . . . ." (Doc. 15 at 1100). As "neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet,'" the ALJ did not err in failing to address whether McPhee's impairment or impairments met or medically equaled Listing 1.04(B). (Doc. 15 at 1098, quoting *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).

Next, McPhee argues that the ALJ erred by making a Step Three finding without a medical opinion on equivalence. (Doc. 12 at 1074-77). The Commissioner does not contest that this was error, but instead asserts that the error was harmless because

---

[2] I note that the ALJ in her opinion neglected to mention even one instance of McPhee's having a limited range of motion in her spine or a positive straight-leg raising test. (Tr.17-28).

McPhee experienced "inconsistent radicular symptoms," "frequent normal strength," and "functional or normal range of motion." (Doc. 15 at 1101-02).

Medical equivalency determinations are treated differently from whether a claimant meets a listing. *E.g.*, *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *12 (E.D. Mich. Sept. 25, 2013). Social Security Ruling 96-6p[3] states that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the commissioner on the issue of equivalence on the evidence before the [ALJ] . . . must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Fowler*, 2013 WL 5372883, at *12 (citing *Barnett v. Barnhart*, 381 F.3d. 664, 670 (7th Cir. 2004)). According to the Sixth Circuit, "Generally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. 1995). The need for an expert opinion can be met with the signature of a State agency medical consultant on a Disability Determination Transmittal Form. *See Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2013) *report and recommendation adopted*, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013).

While in some respects the evidence is equivocal as regards Listing 1.04(A), McPhee presents enough evidence, discussed *supra* p.21-22, that "at this juncture, the

---

[3] SSR 96-6p was rescinded and replaced by SSR 17-2p, 2017 WL 3928306, effective March 27, 2017; SSR 96-6p was still in effect at all relevant times in this case.

Court cannot say that, if the ALJ had made the required findings are Step Three, he [or she] necessarily *would have* found that [claimant] does not meet or medically equal the relevant Listing." *Plummer v. Comm'r of Soc. Sec.*, No. 14–12349, 2015 WL 4620648 at *1, *10 (E.D. Mich. July 31, 2015) (emphasis in original). It is not for this court to weigh the evidence or act as factfinder. *See Bolla v. Comm'r of Soc. Sec.*, No. 11-11008, 2012 WL 884820 at *1, *6-7 (E.D. Mich. Feb. 3, 2012). Nor does the court have the medical expertise to determine whether McPhee's impairment or impairments met the equivalency requirement. *Harris v. Comm'r of Soc. Sec.*, No. 12-10387, 2013 WL 1192301, at *8 (E.D. Mich. Mar. 22, 2013) (noting the court lacks the medical expertise to determine whether the claimant's impairments met the equivalency requirement).

For the reasons discussed above, this error is not harmless. Further, this decision is consistent with this court's decision in *Snell*, where the ALJ had analyzed Listing 1.04 "in one sentence wherein he concluded: 'The claimant can walk, so he does not meet Listing 1.04." *Snell v. Comm'r of Soc. Sec.*, 2016 WL 1128421 at *1, *4 (E.D. Mich. Feb. 17, 2016). There, as well, this court remanded the case for the Commissioner "to undertake the proper analysis under Listing 1.04 and to gather expert medical opinion evidence on whether Plaintiff's impairment or combination of impairments met or medically equaled the severity of a Listing." *Id.* at *6.

Once the court determines that the Commissioner's administrative decisions are not supported by substantial evidence, the court faces a choice: either remand the case to the Commissioner for further proceedings, or direct the Commissioner to award benefits.

The court may do the latter "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits," in a case "where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Serv.*, 17 F.3d 171, 176 (6th Cir. 1994). This is not such a case. Here, the ambiguous medical evidence dictates that I remand the case to the Commissioner to seek an expert medical opinion for her future medical equivalency determination, and for further analysis as appropriate.

Since the issue of the ALJ's improper Step Three analysis is determinative, I do not reach the other issues that McPhee raised.

## H. Conclusion

For the reasons stated above, I find that the ALJ's decision, which ultimately became the final decision of the Commissioner, is not supported by substantial evide

## II. <u>ORDER</u>

In light of the above findings, **IT IS ORDERED** that McPhee's Motion for Summary Judgment, (Doc. 12), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (Doc. 15), be **DENIED,** and this case be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for the Commissioner to undertake the proper analysis under Listing 1.04 and to gather medical opinion evidence on whether McPhee's impairment or combination of impairments medically equaled the severity of a Listing.

Date: September 26, 2017          S/ PATRICIA T. MORRIS
                                  Patricia T. Morris
                                  United States Magistrate Judge

## **CERTIFICATION**

      I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 26, 2017                 By s/Kristen Castaneda
                                         Case Manager